******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* MICHAEL RICHEY
## (AC 46170)

Alvord, Cradle and Clark, Js.

### *Syllabus*

The defendant, who had been convicted, following a jury trial, of the crime of threatening in the second degree, appealed to this court, claiming that there was insufficient evidence to support his conviction and that the trial court erred in refusing to provide the jury with an instruction on defense of premises. The victim, P, was a state marshal who had entered the defendant's property to serve the defendant with court documents in a civil matter. P was accompanied by a state trooper, O, whose body camera recorded the interaction between the defendant and P. The defendant repeatedly told P that P had previously been told not to trespass on his property and, after P had returned to his vehicle, stood outside the vehicle door and stated, inter alia, that "you're going to get a bullet in your head," and "I'll go to jail. I don't give a shit." At trial, the state introduced testimony from O and P and O's body camera footage. *Held*:

1. The defendant could not prevail on his claim that the evidence was insufficient to sustain his conviction because his statements did not constitute true threats: a reasonable person would have foreseen that P would interpret the defendant's statements as a serious threat of harm or assault, as, inter alia, the defendant asserted during the interaction that he was willing to accept the consequences of carrying out his threats, and P's behavior in bringing O with him to serve the documents and in remaining in his car once the defendant became confrontational demonstrated that he took the defendant's threats seriously; moreover, the defendant's assertion that his threatened violence was allegedly not imminent and was premised on a contingent future event was unpersuasive because those conditions are not a requirement for a true threat.

2. The trial court properly denied the defendant's request to provide the jury with an instruction on defense of premises; the defendant failed to meet his burden of production to provide evidence that P was criminally trespassing on his property, as the evidence adduced at trial would not have enabled the jury to reasonably infer anything other than that P believed that he was rightfully carrying out his duties as a state marshal when he entered the defendant's property to serve him with court documents and that P was not aware of any alleged no trespassing signs or orders barring him from the property.

Argued March 6—officially released June 18, 2024

*Procedural History*

Substitute information charging the defendant with two counts of the crime of threatening in the second degree, brought to the Superior Court in the judicial district of Tolland, geographical area number nineteen, and tried to the jury before *Klatt, J.*; verdict and judgment of guilty of one count of threatening in the second degree, from which the defendant appealed to this court. *Affirmed*.

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Jonathan M. Shaw*, assistant state's attorney, and *Jaclyn Preville*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, Michael Richey, appeals from the judgment of conviction, rendered after a jury trial, of threatening in the second degree in violation of General Statutes § 53a-62 (a) (2) (A).[1] On appeal, the defendant claims that (1) the evidence before the trial court was insufficient to sustain his conviction and (2) the trial court erred in refusing to provide the jury with an instruction on defense of premises. We affirm the judgment of the trial court.

Evidence of the following facts and procedural history are relevant to our consideration of the defendant's claims on appeal. On February 25, 2020, at approximately 4 p.m., State Marshal Timothy Poloski arrived at the defendant's residence on West Shore Road in Ellington, accompanied by Connecticut State Trooper

---

[1] General Statutes § 53a-62 provides in relevant part: "(a) A person is guilty of threatening in the second degree when . . . (2) (A) such person threatens to commit any crime of violence with the intent to terrorize another person . . . ."

Patrick O'Brien, to serve the defendant with court documents in a civil matter. Poloski, who was standing on a deck attached to the defendant's residence, knocked on the door of the residence while O'Brien stood several feet behind him off of the deck. The defendant answered the door, leaving a storm door closed between himself and Poloski. Poloski greeted the defendant and identified himself as a state marshal, showing the defendant the court documents and explaining that it was a notice from M&T Bank about an upcoming hearing. The defendant replied that he had nothing to do with it, and Poloski explained that the paperwork was a notice of injunction related to a camper that was the subject of the hearing. The defendant then came out onto the deck, holding the collar of a dog that had been standing beside him and repeatedly told Poloski to "back off my deck." When the defendant refused to accept in-hand service of the court documents, Poloski dropped them inside the defendant's residence through the open storm door.

O'Brien was making attempts to calm the defendant, who continued to express his displeasure about the matter involving the camper. Meanwhile, Poloski had returned to sit in his car, which was blocked in the defendant's driveway by O'Brien's cruiser. The defendant, pointing at Poloski, began repeatedly to shout that Poloski had been told twice not to trespass and directed O'Brien to arrest Poloski for criminal trespass. After O'Brien declined to do so, the defendant shouted to Poloski, "You come back, I guarantee you, you won't walk away." Despite O'Brien's repeated attempts to diffuse the situation, the defendant continued to address Poloski, leaving the deck and moving toward Poloski's car. The defendant stated, "You come back, [O'Brien's] my witness, you're done. . . . Got it? You come back in any way, shape, or form—I see you in public, just like I did yesterday . . . . You were at the town hall,

same thing, screwing around." The defendant then continued repeatedly to state that Poloski had "been trespassed from [the] property." At the same time, the defendant's dog, which the defendant had released, was jumping on O'Brien in a friendly manner. When O'Brien remarked that the dog was "fine" in response to the defendant's command to the dog to "stay down," the defendant replied that "she's good unless I say something. I'll guarantee you, she's fine."

As O'Brien was returning to his cruiser, the defendant approached Poloski's car, stating, "Trust me, pal. Trust me. I'm going to get even with you. [O'Brien] ain't going to be on your ass all day. You want to fuck with me? Come on, get out of the car. . . . Come on, get out of the car, big mouth. . . . I've fucked with you before, and I've won every goddamned time. You keep fucking around . . . . You see the sign up there? Says absolutely you're trespassing. You keep fucking around, you're going to get a bullet in your head. I'll guarantee you that, pal." At that point, O'Brien walked back toward the defendant, instructing him to go back into his house. The defendant refused to do so and continued to address Poloski, stating, "You keep fucking around, marshal. You go ahead. You keep fucking around. . . . I'll go to jail. I don't give a shit. But, you won't leave. . . . This is your last warning. You can call [inaudible] and ask him whether or not you think I'm not going to do it." O'Brien then returned to his cruiser, and he and Poloski left the premises. Later that day, O'Brien and three other police officers returned to arrest the defendant, and Poloski provided a written statement about the incident.

The operative information, dated December 5, 2022, charged the defendant with two counts of threatening in the second degree in violation of § 53a-62.[2] A jury

[2] Count one of the operative information states in relevant part: "[The defendant] did, with the intent to terrorize another person, to wit: [Poloski], threaten to commit a crime of violence against such person, to wit: 'come

trial was held on December 5 and 6, 2022, during which the state introduced into evidence O'Brien's body camera footage of the incident and the testimony of Poloski and O'Brien. The defendant did not present any evidence. The jury then found the defendant guilty of the first count, threatening in the second degree in violation of § 53a-62 (a) (2) (A), and not guilty of the second count, threatening in the second degree in violation of § 53a-62 (a) (2) (B), and the court, *Klatt, J.*, sentenced the defendant to six months of incarceration, execution suspended, with a one year conditional discharge, the conditions of which required him to have no contact with Poloski and no new arrests. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the defendant claims that the evidence is insufficient to sustain his conviction for threatening because his statements did not constitute true threats and were, therefore, protected by the first amendment to the United States constitution.[3] We disagree.

back I guarantee you won't walk away,' 'you come back you're done,' 'this is not going to end well,' ' trust me pal, I'm going to get even with you, he isn't going to be on your ass all day,' 'you keep fucking around you're going to get a bullet in your head I guarantee you that pal,' 'you keep fucking with me you're going to get it,' 'I'll go to jail I don't give a shit but you won't leave,' any of which statements viewed on their own, or in conjunction with each other, constitute a violation of § 53a-62 (a) (2) (A) . . . ."

Count two of the operative information states in relevant part: "[The defendant] did, with reckless disregard of the risk of causing terror to another person, to wit: [Poloski], threaten to commit a crime of violence against such person, to wit: 'come back I guarantee you won't walk away,' 'you come back you're done,' 'this is not going to end well,' ' trust me pal, I'm going to get even with you, he isn't going to be on your ass all day,' 'you keep fucking around you're going to get a bullet in your head I guarantee you that pal,' 'you keep fucking with me you're going to get it,' 'I'll go to jail I don't give a shit but you won't leave,' any of which statements viewed on their own, or in conjunction with each other, constitute a violation of § 53a-62 (a) (2) (B) . . . ."

[3] For jurisprudential reasons, we address the sufficiency of the evidence claim first, although this differs from the order in which the claims were presented by the defendant in his principal appellate brief.

The following additional procedural history is relevant to the resolution of this claim. At trial on December 6, 2022, the court's jury charge provided in relevant part: "As to count one, that's the intentional threatening, threatening in the second degree in violation of § 53a-62 (a) (2) (A). The statute defining this offense reads in pertinent part as follows: A person is guilty of threatening in the second degree when that person threatens to commit any crime of violence with the intent to terrorize another person. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. The first element is that the defendant threatened to commit a crime of violence. A crime of violence is one in which physical force is exerted for the purpose of violating, injuring, damaging, or abusing another person. The state must prove that the defendant behaved in a manner that indicated his intent to commit such a crime.

"Now, a threat can only be punishable when it is a true threat, that is, a threat that a reasonable person would understand as a serious expression of an intent to harm or assault, and not mere puffery, bluster, jest, or hyperbole. In determining whether the threat is a true threat, consider the particular factual context in which the allegedly threatening conduct occurred, which could include the reaction of the person allegedly being threatened and the defendant's conduct before and after the allegedly threatening conduct.

"Now, the second element of this count is that the defendant intended to terrorize another person. To terrorize means to cause intense fear or apprehension. A person acts intentionally with respect to a result when his conscious objective is to cause such a result." The jury subsequently found the defendant guilty of threatening in the second degree in violation of § 53a-62 (a) (2) (A).

On appeal, the defendant argues that, rather than true threats, which are punishable under § 53a-62 (a) (2) (A), his statements were "classic examples of hyperbole, bluster, or puffery protected by the first amendment [to the United States constitution]" and, therefore, were not sufficient evidence of any criminal violation.[4]

"The standard of review we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In [*State* v. *DeLoreto*, 265 Conn. 145, 152–53, 827 A.2d 671 (2003)], however, [our Supreme Court] explained that [t]his [c]ourt's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. . . . In cases [in which] that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the [f]irst [a]mendment . . . protect. . . . We must [independently examine] the whole record . . . so as to assure

---

[4] The state argues in its appellate brief that "the defendant's . . . claim that he made his threats in defense of premises . . . implicitly concedes that they were true threats, made to frighten Poloski into leaving the premises." Even if we were to agree with this argument, "it is axiomatic that a defendant may present inconsistent defenses to the jury." *State* v. *Nathan J.*, 294 Conn. 243, 262, 982 A.2d 1067 (2009).

ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) *State* v. *Carter*, 141 Conn. App. 377, 397–98, 61 A.3d 1103 (2013), aff'd, 317 Conn. 845, 120 A.3d 1229 (2015). "We emphasize, however, that the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted a true threat, we accept all subsidiary credibility determinations and findings that are not clearly erroneous." (Internal quotation marks omitted.) *Haughwout* v. *Tordenti*, 332 Conn. 559, 573, 211 A.3d 1 (2019).

"The [f]irst [a]mendment, applicable to the [s]tates through the [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence. . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions [on] the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .

"[For example] the [f]irst [a]mendment . . . permits a [s]tate to ban a true threat. . . .

"True threats encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . .

"Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. . . . In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." (Citations omitted; internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 448–50, 97 A.3d 946 (2014).

"[O]ur Supreme Court has stated that [a]lleged threats should be considered in light of their entire factual context . . . . Moreover, our Supreme Court has identified several factors that a court may use to assess the factual context in which an alleged threat is made, including (1) the history of the relationship between the person who made the alleged threat and the person or group to whom it was addressed, (2) the reaction of the statement's recipients, and (3) whether the person who made the statement showed contrition immediately after the statement was made." (Citation omitted; internal quotation marks omitted.) *State* v.

*Taupier*, 197 Conn. App. 784, 805, 234 A.3d 29, cert. denied, 335 Conn. 928, 235 A.3d 525 (2020), cert. denied, U.S. , 141 S. Ct. 1383, 209 L. Ed. 2d 126 (2021).

In the present case, the defendant's statements to Poloski were neither political hyperbole nor a mere joke. Rather, a reasonable person would have foreseen that Poloski would interpret the statements as a serious threat of harm or assault. The evidence was sufficient to support such a finding in light of the defendant's apparent attempts to communicate the seriousness of his threats. For example, the defendant asserted that he was willing to accept the consequences of carrying out his threats, by stating, "I'll go to jail. I don't give a shit. But you won't leave." He also demonstrated a willingness to take immediate action by approaching Poloski's vehicle and inviting him to "come on, get out of the car." Further, the jury could have inferred from the defendant's statement that "[O'Brien] ain't going to be on your ass all day" that, although O'Brien was providing Poloski with immediate protection, the defendant could carry out his threats at a time when Poloski was without a police escort. The defendant even invited Poloski to verify that the defendant would carry out his threats by stating, "You can call [inaudible] and ask him whether or not you think I'm not going to do it." Therefore, a reasonable person would have foreseen that Poloski would interpret the defendant's statements as serious threats of harm.

The factual context surrounding the incident further supports this conclusion. First, the record suggests a problematic history. Poloski, whose duties require him to serve the defendant with legal paperwork from time to time, testified that he felt the need to ask a state trooper to accompany him to the defendant's residence on February 25, 2020. He testified that, although he had been a marshal for more than thirty years, he had only asked for a police escort when serving papers a couple

of times and that it was "very, very rare" to do so. Second, Poloski's reaction to the defendant's threats is telling. Poloski testified that he was concerned about the threats in light of the defendant's statement that he sees Poloski around town, because Poloski is in public every day, unarmed and without a bulletproof vest. He testified that he took the defendant's statements as serious threats. His testimony is supported by evidence that he retreated to his car and remained there once the defendant became confrontational, and that, despite being contacted on a later date to once again serve the defendant, he referred the work to another marshal as a result of the incident. Third, there is no evidence in the record that the defendant showed any contrition. To the contrary, the evidence reveals that he continued making threats until Poloski and O'Brien left the premises.

The defendant's argument that his case is analogous to *State* v. *Parnoff*, 329 Conn. 386, 186 A.3d 640 (2018) is unpersuasive. In *Parnoff*, two workers entered the private property of the defendant, Laurence V. Parnoff, pursuant to an easement, and explained to him that they were employed by the water company to perform maintenance on a fire hydrant located on his property. Id., 388, 391. Parnoff became "very upset, throwing his arms up and down, yelling, and [telling] them to leave his property multiple times." Id., 391. "Despite [the water company employees'] explanation, [Parnoff] told [them] that they had no right to be on his property. According to [one of the employees], [Parnoff] then told him that, 'if [they] didn't get off his property, he was going to get a gun . . . [t]o shoot [them].' " Id. The court concluded that Parnoff's statement did not constitute fighting words. The court's discussion and holding in *Parnoff*, therefore, involved only the fighting words exception to protected speech, because "[t]he state pursued this case as a fighting words case—not

a true threats case—and the jury was not charged under the true threats doctrine." Id., 405. Resultantly, this case is not instructive.

We are similarly unconvinced by the defendant's argument that his case is distinguishable from *State* v. *Pelella*, 327 Conn. 1, 170 A.3d 647 (2017). In *Pelella*, the defendant, Michael Pelella, was involved in an altercation with his brother, who "reported to the police that [Pelella] had told him, if you go into the attic I will hurt you." (Internal quotation marks omitted.) Id., 4. Our Supreme Court held that "a jury reasonably could find that [Pelella's] statement was an unprotected true threat prohibited by § 53a-62 (a)"; id., 10; reasoning, in part, that the statement was unambiguous. Id., 20. The defendant in the present case argues that his statements, in contrast, were "ambiguous, not direct." Several of the defendant's statements, as found in the record, belie this assertion. For example, the defendant's statement, "[if] you come back, I guarantee you, you won't walk away," like Pelella's statement, was unambiguously an ultimatum. See *State* v. *Pelella*, supra, 20 ("unlike the precatory statements at issue in [*State* v. *Krijger*, supra, 313 Conn. 440]—for example, I'm going to be there [when you get hurt] . . . the statement in the present case unambiguously communicated not a wish but an ultimatum" (citation omitted; internal quotation marks omitted)).

Further, the defendant's assertion that the violence he threatened was allegedly not imminent and was "premised upon a contingent future event" is unpersuasive because imminence is neither a requirement nor the primary focus in determining whether a statement constitutes a true threat. See *State* v. *Pelella*, supra, 327 Conn. 17 ("[t]hough relevant, the primary focus of our inquiry is not immediacy but whether the threat convey[s] a gravity of purpose and likelihood of execution" (internal quotation marks omitted)); *State* v. *DeLoreto*,

supra, 265 Conn. 158 ("[i]mminence . . . is not a requirement under the true threats doctrine"). Similarly, our courts have rejected claims that a threat of conditional future action cannot constitute a true threat. See, e.g., *State* v. *Pelella*, supra, 3–4; *State* v. *Cook*, 287 Conn. 237, 256–58, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Accordingly, we conclude that the defendant's statements were true threats, and his claim that the evidence was insufficient to sustain his conviction fails.

## II

The defendant also claims that the trial court erred in refusing to provide the jury with his requested instruction on defense of premises. He argues that "the evidence sufficiently established that [he] reasonably believed that he was using reasonable force to prevent a criminal trespass on his property" and that "[t]his issue should have been determined by the jury, as trier of fact." We are not persuaded.

The following procedural history is relevant to the resolution of this claim. On December 5, 2022, the defendant filed a request to charge that included an instruction on defense of premises.[5] The court, *Klatt, J.*, denied

---

[5] The defendant's proposed jury instruction provided in relevant part: "A person is justified in the use or threatened use of force against another person that would otherwise be illegal if he is acting in the defense of premises. It is a complete defense to certain crimes, including threatening in the second degree. When, as in this case, evidence that the defendant's actions were in defense of premises is introduced at trial, the state must not only prove beyond a reasonable doubt all the elements of the crime charged to obtain a conviction but must also disprove beyond a reasonable doubt that the defendant acted in defense of premises. If the state fails to disprove beyond a reasonable doubt that the defendant acted in defense of premises in accordance with my instructions, you must find the defendant not guilty of threatening in the second degree despite the fact that you have found the elements of that crime proved beyond a reasonable doubt. The defendant has no burden of proof whatsoever with respect to this defense. . . .

"To convict the defendant of threatening in the second degree, the state must disprove beyond a reasonable doubt one of the following elements:

the defendant's request to charge, reasoning that "both

"*Element 1—Right to defend premises*

"The first element is that the defendant had possession or control of the premises. . . .

"*Element 2—From a criminal trespass*

"The second element is that . . . Poloski was criminally trespassing on the premises. The right to defend premises does not allow the use or threatened use of physical force every time someone enters those premises without consent. For example, the use or threatened use of force may not be used against someone who enters the premises merely by accident or mistake. Rather, the use of threatened use of physical force may be used only to prevent an actual or attempted criminal trespass.

"In this case, the defendant contends that . . . Poloski committed a criminal trespass in the third degree, in violation of [General Statutes] § 53-109 (a) (1). . . .

"For . . . Poloski to have committed a criminal trespass, he must have entered or remained on premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders, or fenced or otherwise enclosed in a manner designed to exclude intruders.

"It must also be shown that . . . Poloski unlawfully entered or remained on the premises. A person unlawfully enters or remains when he is not licensed or privileged to do so. To be 'licensed or privileged,' [Poloski] must either have consent from the person in possession of the premises or have some other right to be on the premises. . . .

"A state marshal, acting in the performance of execution or service of process functions, has the right of entry on private property. It is up to you to decide whether or not the state has proven beyond a reasonable doubt that . . . Poloski was a state marshal acting in the performance of his duties giving him a right to enter or remain on the premises.

"For . . . Poloski to have committed a criminal trespass, he must also know that he was not licensed or privileged to enter or remain on the premises. A person acts 'knowingly' with respect to conduct or circumstances when he is aware that his conduct is of such nature or that such circumstances exist.

"*Element 3—Actual belief that force was necessary*

"The third element of defense of premises is that the defendant actually—that is, honestly and sincerely—believed that . . . Poloski was trespassing on the premises . . . and was refusing to leave having been asked to. The defendant must have actually believed that the use or threatened use of physical force was necessary to terminate the trespass.

" 'Physical force' means actual physical force or violence or superior physical strength. Physical force may not be used, however, if it reasonably appears that the trespasser is leaving or about to flee, nor may it be used once the trespasser has left the premises, for this would no longer be defensive force, but retaliatory and unlawful force.

"*Element 4—Reasonableness of that belief*

[Poloski and O'Brien] testified that they believed that the state marshal had a right to be there [and] that he was serving papers . . . . Neither [was] aware . . . of any legal order otherwise, that that particular marshal should not have been on the premises. . . .

"[T]he only evidence that we have that perhaps they didn't have that right was [that], while the defendant was speaking . . . he . . . kept repeating to the state trooper that that particular marshal was not allowed on the premises, but that's the only evidence we have. Nothing more. There's nothing that's been presented that suggested there was an actual order, and from the defendant's own mouth, he said . . . this so-called order for this marshal not to be there was apparently given to him from another constable, who would not have any type of authority to take that kind of action or make that kind of order. . . .

"[T]he court, based on that one line that the defendant said—or those few lines that the defendant said, just does not find that to be sufficient evidence.

"The rule is that the evidence must be sufficient that, if credited by the jury, would raise a reasonable doubt in the [mind] of a rational juror. I just don't think that the language that the defendant used would rise to that level."

On appeal, the defendant argues that he had a constitutional right to a jury instruction on a defense of premises defense because he met his burden of production. The defendant further contends that the trial court's

"The fourth element is that the defendant's belief was reasonable, and not irrational or unreasonable under the circumstances. You must ask whether a reasonable person in the defendant's situation, viewing the circumstances from the defendant's point of view, would have shared the belief. In other words, was the defendant's belief that the use or threatened use of physical force was necessary to prevent or terminate the criminal trespass of . . . Poloski reasonable under the circumstances. . . ."

ruling was improperly based on testimony related to the elements of criminal trespass. He argues that this testimony was irrelevant because "defense of premises focuses on the reasonable belief of the person defending the premises, not the beliefs of the persons entering the premises. It is clear from the video . . . that the defendant believed that Poloski had no right to enter the property, and that his doing so was trespassing. . . . Further, there is no evidence that the defendant was aware of the . . . existence [of a statute granting the marshal authority to enter the defendant's premises]." Nevertheless, he also contends that, viewed in the light most favorable to providing the instruction, his assertions that there were no trespassing signs on the property and that there was a court order barring Poloski from the property would establish that Poloski would have known that he was not licensed or privileged to enter the property.[6] Finally, the defendant argues that, in any case, whether Poloski's and the defendant's beliefs about Poloski's right to be on the property were reasonable are disputed points to be resolved by the trier of fact.[7]

The following legal principles are applicable to our resolution of this claim. "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Terwilliger*, 294 Conn. 399, 412, 984

---

[6] The defendant further contends that our state's law should recognize as a trespasser a person who "makes a lawful entry into the property of another [but] . . . refuses to leave upon an order by the owner." Although the defendant cites law from other jurisdictions to support this argument, we decline to address it in the present case because there is no evidentiary support for a finding that Poloski was refusing to leave the defendant's premises.

[7] We note that the defendant also asserted, in his appellate brief, that the omission of the requested instruction was harmful, because it "eradicated" his argument to the jury that he made the threats as a defense of premises against Poloski's criminal trespass. Because we hold that the court did not err in denying his request to charge, we need not decide whether any alleged constitutional violation was harmful.

A.2d 721 (2009). "An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . [T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In reviewing the trial court's failure to charge as requested, we must adopt the version of facts most favorable to the defendant which the evidence would reasonably support." (Citations omitted; internal quotation marks omitted.) *State* v. *Singleton*, 292 Conn. 734, 745–46, 974 A.2d 679 (2009).

"In asserting a claim of defense of [premises], the defendant has only the burden of production, meaning that he merely is required to introduce sufficient evidence to warrant presenting his claim of [defense of premises] to the jury. . . . [T]he evidence adduced by the defendant must be sufficient [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in [defense of premises]. . . . The burden of production on the defendant is slight and may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible . . . and in producing evidence, the defendant may rely on evidence adduced either by himself or by the state to meet this evidentiary threshold. . . . [O]nce a defendant identifies sufficient evidence in the record to support a requested jury charge, he is entitled thereto as a matter of law, even if his own testimony, or another of his theories of defense, flatly contradicts the cited evidence. . . .

"Although the defendant's burden may be slight, [b]efore the jury is given an instruction on [defense of premises] . . . there must be some evidentiary foundation for it. A jury instruction on [defense of premises] is not available to a defendant merely for the asking. . . . However low the evidentiary standard may be, it is nonetheless a threshold the defendant must cross.

. . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation." (Citations omitted; internal quotation marks omitted.) *State* v. *Hall-Davis*, 177 Conn. App. 211, 226–27, 172 A.3d 222, cert. denied, 327 Conn. 987, 175 A.3d 43 (2017).

The justification defense of the use of force in defense of premises is set forth in General Statutes § 53a-20, which provides in relevant part: "A person in possession or control of premises, or a person who is licensed or privileged to be in or upon such premises, is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises . . . ."[8] Therefore, the defendant was required to produce evidence of (1) his right to defend the premises, (2) Poloski's status as a criminal trespasser on those premises, (3) the defendant's actual belief that (a) Poloski was a criminal trespasser and (b) the reasonable physical force the defendant used was necessary to prevent or terminate Poloski's criminal trespass upon the defendant's premises, and (4) the reasonableness of those beliefs. See *State* v. *Terwilliger*, supra, 294 Conn. 409 (defendant must produce evidence that he reasonably believed that victim was trespassing and that extent of force used was necessary); *State* v. *Brunette*, 92 Conn. App. 440, 448, 886 A.2d 427 (2005) (victim must be criminally trespassing in order for defense of premises

---

[8] The defendant argues that, as an issue of first impression in our state, § 53a-20 should apply not only to uses of physical force but also to threats of the use of physical force. We decline the invitation to address this question because we resolve the defendant's claim on the basis of a threshold issue—namely that the evidence presented at trial would not have raised a reasonable doubt in the mind of a rational juror as to whether Poloski was criminally trespassing.

to apply), cert. denied, 277 Conn. 902, 891 A.2d 2 (2006); see also General Statutes § 53a-20. Pursuant to the defendant's claim that the court should have instructed the jury on this justification defense theory, the defendant had the burden to introduce evidence sufficient to raise a reasonable doubt in the mind of a rational juror that he was defending his premises from Poloski trespassing on it. A person commits criminal trespass in the third degree[9] when, "knowing that such person is not licensed or privileged to do so . . . [s]uch person enters or remains in premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or are fenced or otherwise enclosed in a manner designed to exclude intruders . . . ." General Statutes § 53a-109 (a) (1).

In particular, evidence that Poloski was criminally trespassing on the defendant's property on February 25, 2020, would be a prerequisite to a finding that the defendant's use of force was justified under the theory of defense of premises. See *State* v. *Brunette*, supra, 92 Conn. App. 448 ("[i]n order for [§ 53a-20] to apply in this case, the victims . . . would need to have been criminal trespassers pursuant to General Statutes

---

[9] The defendant, in his proposed jury charge, contended that "Poloski committed criminal trespass in the third degree, in violation of [General Statutes] § 53a-109 (a) (1)." The defendant, in his appellate brief, also contends that Poloski committed criminal trespass in the first degree, in violation of General Statutes § 53a-107. Although the court, in denying the defendant's request to charge, "turned to the instruction on criminal trespass in the *first degree* and . . . second and third degree"; (emphasis added); we decline to review the defendant's claim on appeal that Poloski committed criminal trespass in the first degree. The trial court made its ruling as to the request to charge on the basis of an element common to §§ 53a-107 and 53a-109, stating that "all [of the criminal trespass instructions] . . . refer to the second element as knowledge, that the defendant knew that he was not licensed or privileged to be in a place. . . . Both [O'Brien and Poloski] believed that . . . [Poloski] had the right to be present on the property and serving the paperwork." Because we, like the trial court, resolve the defendant's appellate claim on the basis of this common element, a separate analysis of criminal trespass in the first degree is unnecessary.

§§ 53a-107, 53a-108 and 53a-109"). A reasonable jury can only make a finding of criminal trespass if the alleged trespasser *knew* that he was not licensed or privileged to enter or remain on the defendant's premises. See *Burke* v. *Mesniaeff*, 334 Conn. 100, 116–17, 220 A.3d 777 (2019); see also General Statutes §§ 53a-107, 53a-108 and 53a-109. Therefore, before reaching the defendant's arguments as to the reasonableness of his own beliefs, a threshold question is whether the evidence adduced at trial, if credited by the jury, was sufficient to raise a reasonable doubt in the mind of a rational juror as to whether Poloski knew that he was not licensed or privileged to be on the defendant's property. "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ." (Internal quotation marks omitted.) *State* v. *Harper*, 167 Conn. App. 329, 337, 143 A.3d 1147 (2016); see id., 337–38 (applying statutory definition of "knowingly" to determination of whether defendant charged with criminal trespass knew that he was not licensed or privileged to be on premises); see also General Statutes § 53a-3 (12).

As revealed by the body camera video footage admitted into evidence, the defendant repeatedly accused Poloski of having "trespassed twice" and that he was "told twice to stay off of here." He also made one reference to a sign "up there" that "[s]ays absolutely" Poloski was trespassing. Lastly, he asserted that a police sergeant "[has] got the notice" and offered to "dig out the sheet" that ostensibly would show that Poloski was trespassing. He alleged that, on a previous occasion, he had "served [Poloski] back, saying that [Poloski was] not allowed on [his] property for that camper whatsoever" and that M&T Bank's lawyer had told Poloski twice to stay off the property.

Even if the jury were to credit the statements the defendant made to Poloski, as recorded by O'Brien's body camera, those statements do not establish that Poloski knew that he was not licensed or privileged to serve the defendant with process on that day. The evidence adduced at trial would not enable the jury to reasonably infer anything other than that Poloski believed that he was rightfully carrying out his legal duty as a state marshal when he entered the defendant's property to serve him with court documents on February 25, 2020. See generally *State* v. *Hargett*, 343 Conn. 604, 625, 275 A.3d 601 (2022) (holding that defendant did not uphold his burden of production and was not entitled to instruction of self-defense); see also General Statutes § 6-38a (b) (providing in relevant part that "[a]ny state marshal, shall, in the performance of execution or service of process functions, have the right of entry on private property"). The evidence at trial reflected that Poloski was not aware of any alleged no trespassing signs[10] or any alleged order barring him from the defendant's property[11] and that he and O'Brien

[10] Poloski testified that he did not open a gate to get onto the defendant's property and that he did not recall seeing any no trespassing signs. O'Brien also testified that he did not notice any no trespassing signs anywhere, and there were no signs depicted in his body camera video footage.

[11] The following colloquy took place between the prosecutor and Poloski at trial on December 5, 2022:

"[The Prosecutor]: To your knowledge, was there any legal order preventing you from being there?

"[Poloski]: No. There was not.

"[The Prosecutor]: Had anyone told you that you weren't allowed to go there?

"[Poloski]: No."

The following colloquy took place between defense counsel and Poloski at trial on December 5, 2022:

"[Defense Counsel]: [Y]our testimony is [that] you never received any notice from M&T Bank not to go to [the defendant's] property?

"[Poloski]: No.

"[Defense Counsel]: Nothing that you recall?

"[Poloski]: I have no idea—I don't have any idea what that's about. I don't know if that was another marshal or something else or what. It wasn't me.

"[Defense Counsel]: You were never told by their attorney or a judge not to go onto [the defendant's] property?

both believed that he was licensed and privileged to enter the property on that day to serve court documents on the defendant.[12] For the foregoing reasons, we conclude that the defendant did not satisfy his burden of production to establish an evidentiary foundation that Poloski committed a criminal trespass, and, thus, a jury instruction on defense of premises, which depends on such evidence, would be misleading and therefore constitutionally improper.[13] See, e.g., *State* v. *Terwilliger*, supra, 294 Conn. 416–17 (concluding that jury instruction that "could have misled a reasonable juror" violated

"[Poloski]: No. The attorney is the one that sent me there.

"[Defense Counsel]: You never received any sort of written notice . . . in the mail or served on you?

"[Poloski]: No. Nothing."

[12] The following colloquy took place between the prosecutor and Poloski at trial on December 5, 2022:

"[The Prosecutor]: [The defendant] indicated that you weren't allowed to be there, correct?

"[Poloski]: He did . . . say that while he was talking. I don't know what he was referring to. We do have a right to go onto private property as state marshals to serve a legal notice."

The following colloquy took place between defense counsel and Poloski at trial on December 5, 2022:

"[Defense Counsel]: Do you recall on [the video] footage where [the defendant] says to you—he refers to some no trespassing signs as you've absolutely—look at the sign, absolutely no trespassing? Do you recall that part? . . .

"[Poloski]: I remember him yelling this. Yeah.

"[Defense Counsel]: But you don't recall whether or not you saw those signs when you came in?

"[Poloski]: Yeah, because, I mean, we . . . still have to go onto the property to make service of process. . . . [T]hat is part of what our job is. . . . It wouldn't have made a difference if he had that sign or not."

Further, the video footage reveals that, in response to the defendant's assertion that Poloski "had been told twice to stay out," Poloski replied, "I have to. It's my legal duty to deliver that notice." O'Brien also responded that "[Poloski's] not trespassing. . . . He's serving you legal notice," and he later reminded the defendant that Poloski "was trying to explain . . . that he has a legal obligation to deliver service."

[13] Because we resolve this claim on the basis of the defendant's failure to meet his burden of production, we need not address the arguments in his appellate brief that the state failed to meet its burden. See *State* v. *Bryan*, 307 Conn. 823, 835, 60 A.3d 246 (2013) ("[o]nly when [a defense] has been sufficiently raised does the state have the burden of disproving such a defense beyond a reasonable doubt" (internal quotation marks omitted)).

defendant's due process right to fair trial). Accordingly, we conclude that the court properly denied the defendant's request to charge, and the defendant's claim fails.[14]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14] The state asserts, as an alternative ground for affirmance, that a defense of defense of premises does not apply to criminal conduct in response to entries by police officers or individuals accompanied by police officers. Because we affirm the court's ruling as to the jury instruction on the basis that the defendant had not met his burden of production, we need not reach the state's proposed alternative ground for affirmance.